*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARY SPARLING,

　　　　　Plaintiff-Appellee,

v

JOHN R. SPARLING, as Co-Trustee of the
WALTER SPARLING IRREVOCABLE
GRANTOR TRUST,

　　　　　Defendant-Appellant,

and

GREGORY L. SPARLING, as Co-Trustee of the
WALTER SPARLING IRREVOCABLE
GRANTOR TRUST,

　　　　　Defendant,

v

JEFFERY S. SPARLING, WILLIAM SPARLING,
VICKI TURNBULL, DELORES GAUVEY, and
JUDITH MILLER,

　　　　　Interested Parties.

UNPUBLISHED
June 16, 2022

No. 355843
St. Clair Probate Court
LC No. 17-000427-CZ

Before: LETICA, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

Defendant John R. Sparling appeals by right the trial court's opinion and order invalidating the Walter Sparling Irrevocable Trust. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Walter Sparling and Mary Sparling were husband and wife, and married for 66 years before Walter's death in 2013. Walter and Mary had eight children: defendants John Sparling and Greg Sparling, interested parties Vicki Turnbull, Judith Miller, Delores Gauvey, Jeffrey Sparling, and William "Chuck" Sparling, and nonparty Wayne Sparling.[1]

Sometime in late November or early December 2012, Greg contacted Gary Fletcher, an attorney who had represented Walter and his businesses in the past. Fletcher arranged to meet with Greg, Walter, Mary, John, and Vicki at the Sparlings' business office to discuss upcoming tax changes that could have an impact on Walter and Mary's estates. Specifically, there was a concern that at the end of 2012, the estate tax exemption would decrease from $5 million to $1 million, which would have a significant impact on their wealth.

At the meeting, Fletcher explained the tax situation to Walter and his family. Fletcher told the family that if the tax cuts were not extended beyond 2012, the Walter's revocable trust could pay higher taxes for all amounts above $1 million. According to Fletcher, Walter appeared to understand the implications of the potential change in tax treatment, and told Fletcher that he did not want to pay any more in taxes than he needed to.

After the meeting, Greg contacted Fletcher's office and instructed the firm to prepare the Irrevocable Trust. Walter did not have any input as to what assets would be used to fund the trust; that decision was made by John. John also signed a W-9 form as trustee of the Irrevocable Trust on December 13, 2012, even though no trust had been formed yet. Greg also contacted Tom Coleman, a family friend and notary public, to meet Walter at his house on December 14, 2012, to execute the trust documents. Walter, who was very sick that day, did not read the Irrevocable Trust before signing it. Although there were two signature blocks for witnesses as well, no witnesses observed Walter sign nor did any witnesses sign the Irrevocable Trust while Coleman was present. After Coleman notarized the Irrevocable Trust, John had two witnesses sign the already-notarized document.

Under the Irrevocable Trust, Walter acknowledged that the trust was "irrevocable" and that he "stands without power at any time to revoke, change, alter, amend or annul any of the provisions" of the Irrevocable Trust. John and Greg, as co-trustees of the Irrevocable Trust, were given the power to "pay over and distribute any portion or all of the remaining net income and principal" to the beneficiaries. John and Greg were also required to "distribute, pay over, and transfer to each beneficiary in equal shares, all of the property remaining in the trust ten years from the date of the Trust."

Two days later, on December 16, 2012, Walter began experiencing health problems and was admitted to the hospital for pneumonia. At the time, Walter was also experiencing chronic health issues related to his heart, kidney, and cognitive functions. Although eventually discharged, hospital staff had Mary sign Walter's discharge papers because he did not appear capable of understanding the after-care instructions. Walter died in November 2013.

---

[1] For ease of reading and to diminish confusion, we will refer to the parties by their first names.

On August 17, 2017, Mary filed a complaint with the trial court seeking to invalidate the Irrevocable Trust. Mary alleged that copies of the Irrevocable Trust were not provided to her or Walter before signing them. Mary also alleged that on the day Walter signed the Irrevocable Trust, his health was in such poor condition that he did not understand what he was signing. On September 12, 2017, John answered the complaint and asserted various affirmative defenses.[2]

On October 25, 2017, John filed a motion for summary disposition under MCR 2.116(C)(7), asserting that the complaint was barred under the statute of limitations. In his motion, John argued that under MCL 700.7604, Mary's complaint was subject to a two-year statute of limitations. John also argued that even if the two-year limitations period did not apply, the three-year limitations for recovery of lost or stolen property, *i.e.*, conversion, under MCL 600.5805(10) applied to bar Mary's claims. The trial court rejected these arguments, concluding neither limitations period applied to Mary's complaint.

A jury trial commenced on February 12, 2019, to determine whether Walter had the requisite mental capacity to form the Irrevocable Trust. Ultimately, the jury returned a verdict that Walter did not have the requisite mental capacity on December 14, 2012, to form the Irrevocable Trust.

On February 3, 2020, the trial court began a bench trial to determine whether any of John's affirmative defenses applied, notwithstanding the jury's verdict. On December 7, 2020, the trial court entered a written opinion and order rejecting each of John's affirmative defenses. The trial court's order dissolved the Irrevocable Trust and returned all of its assets to Walter's revocable trust. This appeal followed.

## II. STANDARDS OF REVIEW

"This Court . . . reviews de novo a trial court's decision on a motion for summary disposition." *Dell v Citizens Ins Co of America*, 312 Mich App 734, 739; 880 NW2d 280 (2015). In a motion under MCR 2.116(C)(7):

> [T]his Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [*Hutchinson v Ingham Co Health Dep't*, 328 Mich App 108, 123; 935 NW2d 612 (2019) (quotation marks and citation omitted) (alteration in original).]

---

[2] Greg, a named defendant, did not defend the lawsuit because he believed the allegations in the complaint to be true.

In addition, "[t]his Court reviews questions of statutory interpretation de novo." *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 470; 719 NW2d 19 (2006). "The role of this Court in interpreting statutory language is to ascertain the legislative intent that may reasonably be inferred from the words in a statute." *Mich Ass'n of Home Builders v Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019) (quotation marks and citations omitted). "[W]here the statutory language is clear and unambiguous, the statute must be applied as written." *Id*. (quotation marks and citations omitted) (alteration in original).

We "review[] a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

## III. ANALYSIS

John first claims that the trial court erred when it denied his motion for summary disposition on the issue of whether Mary's claims are barred by the statute of limitations. Specifically, John claims the trial court erred when it concluded that Mary's claims were not subject to the two-year limitations period in MCL 700.7604 or the three-year limitations period in MCL 600.5805. With respect to the limitations period under MCL 700.7604, the trial court rejected the idea that the statute would apply because, by its terms, the limitations period only applies to revocable trusts. And with respect to the limitations period under MCL 600.5805, the trial court also concluded that section did not apply because Mary's complaint was not for the return of ill-gotten property. In neither case did the trial court err.

Under MCL 700.7604, a two-year limitations period applies to actions contesting the validity of revocable trusts. Specifically, that statute states, in relevant part:

> (1) A person may commence a judicial proceeding to contest the validity of *a trust that was revocable at the settlor's death* within the earlier of the following:
>
> (a) Two years after the settlor's death.
>
> (b) Six months after the trustee sent the person a notice informing the person of all of the following:
>
> (*i*) The trust's existence.
>
> (*ii*) The date of the trust instrument.
>
> (*iii*) The date of any amendments known to the trustee.
>
> (*iv*) A copy of relevant portions of the terms of the trust that describe or affect the person's interest in the trust, if any.
>
> (*v*) The settlor's name.
>
> (*vi*) The trustee's name and address.

(*vii*) The time allowed for commencing a proceeding.  [MCL 700.7604(1) (emphasis added).]

It is clear by the terms of the statute that the limitations periods in MCL 700.7604 apply only to "a trust that was revocable at the settlor's death . . . ."  A revocable trust is defined as a trust "revocable by the settlor without the consent of the trustee or a person holding an adverse interest."  MCL 700.7103(h).

There is no dispute that the Irrevocable Trust was not revocable at Walter's death.  Moreover, John has offered this Court no authority that this Court should ignore the plain words of the statute when deciding this issue.  The Irrevocable Trust simply does not fall within the ambit of MCL 700.7604, and we emphatically reject John's suggestion that we ignore the words in the statute.  See *Mich Ass'n of Home Builders*, 504 Mich at 212 ("[W]here the statutory language is clear and unambiguous, the statute must be applied as written.") (quotation marks and citations omitted) (alteration in original).

Perhaps in anticipation of the issues with the preceding argument, John claims that the reference to revocable trusts applies equally to irrevocable trusts because once a settlor is deceased, all of the settlor's trusts become irrevocable.  This argument, however, again ignores the plain words of the statute, which clearly focuses on the time period immediately preceding the settlor's death, not after.  To read the statute otherwise would render the term "revocable" surplusage, as the qualifier would be unnecessary under John's interpretation.  See *Ayotte v Dep't of Health and Human Servs*, 337 Mich App 29, 39; 972 NW2d 282 (2021) (stating this Court will "avoid a construction that would render any part of the statute surplusage or nugatory") (quotation marks and citations omitted).  In other words, if the Legislature intended that all trusts—revocable or irrevocable—were subject to MCL 700.7604, it would not have needed to add the phrase "revocable at the settlor's death."  Accordingly, the trial court did not err when it denied John's motion for summary disposition on the basis that MCL 700.7604 barred Mary's claims.

Similarly, we find unpersuasive John's contention that Mary's claims are barred under MCL 600.5805.  While John's argument does not suffer from the same infirmities as the preceding argument, it is based on a mischaracterization of the complaint.

John claims that the complaint is not to determine Walter's mental capacity, but rather one for conversion.  Conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."  *Lawsuit Financial, LLC v Curry*, 261 Mich App 579, 591; 683 NW2d 233 (2004) (quotation marks and citation omitted).  To establish conversion, a plaintiff must show: (1) a distinct act of dominion; (2) wrongfully exerted; and (3) over another's personal property.  *Check Reporting Servs, Inc v Mich Nat'l Bank-Lansing*, 191 Mich App 614, 626; 478 NW2d 893 (1991).  The limitations period for a conversion claim is three years.  MCL 600.5805.

The plain language of Mary's complaint defeats this argument.  In her complaint, Mary alleged she and Walter signed their respective irrevocable trusts after meeting with Fletcher, but that the actual documents were never read to or reviewed by them.  Mary further alleged that as a result of Walter's failing health, he did not have the requisite mental capacity to form the intent to

create the Irrevocable Trust. Thus, Mary sought an order deeming the Irrevocable Trust invalid and transferring all assets to Walter's Revocable Trust.

John is correct that this Court must read the complaint as a whole and should "look beyond the mere procedural labels used in the pleadings." See *Wiggins v Burton*, 291 Mich App 532, 561; 805 NW2d 517 (2011). But an analysis of the complaint, omitting procedural labels, does not lead us to the conclusion that Mary filed a claim for conversion. In many ways, this argument suffers from the same problems as the preceding one, in that it asks this Court to ignore the plain words on the page in favor of a misguided interpretation. If John's argument were correct, most, if not all claims to invalidate a trust would be a claim for conversion, rendering MCL 700.7604 nugatory, because all claims would be properly addressed under MCL 600.5805. We reject such an interpretation of the complaint. See *Ayotte*, 337 Mich App at 39.

In sum, the trial court did not err in its conclusion that neither MCL 700.7604 nor MCL 600.5805 time-barred Mary's complaint. Accordingly, we affirm the order of the trial court denying John's motion for summary disposition under MCR 2.116(C)(7).

Turning next to the trial court's decision to invalidate the Irrevocable Trust, John first argues that notwithstanding the jury's verdict regarding that Trust, a separate oral trust was formed during the meeting with Fletcher in the preceding days. We disagree.

Under MCL 700.7407, "a trust need not be evidenced by a trust instrument, but the creation of an oral trust and its terms may be established only by clear and convincing evidence." In *Kefgen v Davidson*, 241 Mich App 611, 625; 617 NW2d 351 (2000) (quotation marks and citations omitted) (alterations in original), we explained that clear and convincing evidence is evidence that

> "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

In addition, to create a trust, oral or written, all of the following factors must be met:

(a) The settlor has capacity to create a trust.

(b) The settlor indicates an intention to create the trust.

(c) The trust has a definite beneficiary or is either of the following:

(*i*) A charitable trust.

(*ii*) A trust for a noncharitable purpose or for the care of an animal, as provided in section 2722.

(d) The trustee has duties to perform.

(e) The same person is not the sole trustee and sole beneficiary. [MCL 700.7402(1).]

In this case, the jury returned a verdict that Walter did not have the requisite mental capacity to create the Irrevocable Trust, a finding that John does not challenge on appeal. Accordingly, if this Court were to focus only on the written Irrevocable Trust (the subject of the jury's verdict), the Irrevocable Trust fails at step one. See MCL 700.7402(1)(a). Yet John contends that the jury's verdict does not apply because the jury only focused on the written instrument, and did not decide whether Walter had the capacity to form an oral trust when he met with Fletcher and his family to discuss the upcoming potential tax changes. When viewed through those facts, John contends that an oral trust was created. We disagree.

There is no evidence to support the creation of an oral trust. During the meeting with Fletcher, John and Greg both testified that Fletcher did most of the talking when he explained the potential tax changes and the possible options available to Walter and Mary. The only statement anyone present remembered Walter saying was that he did not want the government to get more of his money than it was entitled to. This may be evidence that Walter wanted *something* done to counter the potential tax increases at the end of 2012, but it is not clear and convincing evidence that Walter created an oral trust. Moreover, it is evident that, to the extent Walter wanted anything done, he wanted a written trust prepared, evidenced by the fact that one was, in fact, prepared.

Moreover, once the meeting concluded, all parties agree that Walter did not have any further involvement with his financial affairs. Allen Francis, an attorney who worked with Fletcher, testified that he prepared the trust documents at Greg's request, and did not speak with Walter regarding the Irrevocable Trust. Likewise, Walter was never asked and did not have any input as to what assets would be placed into the trust (irrevocable or otherwise), and Greg and John changed the terms of the Irrevocable Trust without Walter's knowledge. In short, there was no evidence presented at either trial, let alone clear and convincing evidence, demonstrating Walter intended to or did in fact create an oral trust.[3]

Next, John argues the trial court erred when it concluded that the doctrine of election did not act to bar Mary's claims. John's assertions that Mary's complaint is barred by the doctrine of election is predicated on the idea that Mary received two benefits through execution of the Irrevocable Trust: (1) avoidance of *potential* tax increases; and (2) peace of mind knowing her children would be taken care of. Neither of these assertions are persuasive.

The doctrine of election is an extension of the law of equitable estoppel. *Holzbaugh v Detroit Bank & Trust Co*, 371 Mich 432, 435-437; 124 NW2d 267 (1963). In *Holzbaugh*, the Michigan Supreme Court explained the doctrine as follows: "If one accepts benefits because she was then satisfied with the will or because she has made up her mind to accept its provisions, then she is estopped from contesting the will." *Holzbaugh*, 371 Mich at 435. Similarly, in *Aiken v*

---

[3] As a companion to this argument, John contends that the trial court erred when it invalidated the Irrevocable Trust because Walter, Mary, and all of the beneficiaries ratified the oral trust. However, because we conclude that the trial court did not err when it determined there was no evidence of an oral trust, John's argument on this point must fail as well. Even if the nonexistence of the oral trust were not an issue for John, we are unconvinced that any party, and especially Mary, ratified the trust.

*Gonser*, 342 Mich 29, 35; 69 NW2d 180 (1955) (quotation marks and citation omitted), the Michigan Supreme Court explained:

> A person cannot accept and reject the same instrument, or, having availed himself of it as to part, defeat its provisions in any other part; and this applies to deeds, wills, and all other instruments whatever . . . . This doctrine of election which prevents the assertion of repugnant rights, is but an extension of the law of equitable estoppel.

We reject the notion that the purported benefits Mary received through the creation of the Irrevocable Trust acted to estop her from invalidating it. In the first instance, Mary never actually received a benefit from the impending tax consequences because the tax increase never occurred. But even if the tax increase had occurred, it was *Walter's* estate, not *Mary's* estate, that stood to benefit from the creation of the Irrevocable Trust. And even if we were to agree that the intangible benefit of peace of mind is sufficient to invoke the doctrine of election, there is no actual evidence that John can point to in the record that demonstrates Mary received such peace of mind. In fact, if there is evidence that points in any direction, it would be that the Irrevocable Trust created anxiety and a great rift within the family. Accordingly, the trial court did not err when it concluded the doctrine of election did not bar Mary's claims.

Lastly, John contends that the trial court erred when it rejected his claim that the doctrine of laches barred Mary's claims. According to John, Mary waited almost five years to bring her claim, despite receiving benefits from it. We disagree.

Under the doctrine of laches, "[i]f a plaintiff has not exercised reasonable diligence in vindicating his or her rights, a court sitting in equity may withhold relief . . . ." *Knight v Northpointe Bank*, 300 Mich App 109, 114; 832 NW2d 439 (2013). "This is so because equity will not lend aid to those who are not diligent in protecting their own rights." *Id*. In other words, "[t]he doctrine of laches is concerned with unreasonable delay, and it generally acts to bar a claim entirely . . . ." *Mich Educ Employees Mut Ins Co v Morris*, 460 Mich 180, 200; 596 NW2d 142 (1999). Where, however, a claim is made within the prescribed statute of limitations, such a claim is "presumptively reasonable, and the doctrine of laches is simply inapplicable." *Id*.

Here, Mary brought her claim within the six-year limitations period in MCL 600.5813. Absent facts to overcome the presumption that the purported delay in bringing the claim was reasonable, we must reject John's argument that laches bars Mary's claims. See *Morris*, 460 Mich at 200. To that end, John advances no persuasive argument that Mary's delay was so unreasonable as to overcome the presumption she filed her complaint within a reasonable time. Similar to his doctrine of election argument, John focuses his analysis on the fact that Mary received certain benefits, such as tax avoidance and peace of mind, through the creation of the Irrevocable Trust. As explained above, these purported benefits are insufficient to overcome the presumption that Mary's delay was reasonable. In addition, John cannot show that whatever the delay, he or other beneficiaries suffered prejudice as a result.

Mary filed her claim within the limitations period, and there is no evidence that her delay in filing the claim was so unreasonable as to invoke the doctrine of laches. The trial court, therefore, did not err when it concluded the doctrine did not apply.

Affirmed. Mary, as the prevailing party, may tax costs. MCR 7.219(A).

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan